W. R. GRIMSHAW COMPANY,
Appellant,

v.

The FIRST NATIONAL BANK AND
TRUST COMPANY OF TULSA,
Oklahoma, Appellee.

No. 47168.

Supreme Court of Oklahoma.

Feb. 15, 1977.

Rehearing Denied May 9, 1977.

Remington Rogers, Tulsa, for appellant.

Donald Church, Church & Roberts, Tulsa, for appellee.

IRWIN, Justice.

Appellee, First National Bank and Trust Company of Tulsa (First National), petitions for Writ of Certiorari to review an opinion of the Court of Appeals reversing a jury verdict on its behalf and entering judgment as a matter of law in favor of appellant, W. R. Grimshaw Company (Grimshaw). For the reasons hereafter discussed, we vacate the opinion of the Court of Appeals; reverse the judgment of the trial court; and remand the cause for a new trial.

The controversy in this appeal centers on three checks drawn by Grimshaw on its account with First National. The first two checks were made payable to Mercantile National Bank of Tulsa (Mercantile) and Building Specialties Company jointly. The last check was payable only to Building Specialties. All three checks were indorsed in one fashion or another and ultimately paid by First National through Grimshaw's account. Grimshaw's action in the trial court was to recover the funds paid by First National from the Grimshaw account alleging the checks paid by First National contained spurious payee indorsements and as such were not properly chargeable to its account.

The dispute over the subject checks is another chapter in the fraudulent schemes of one Harry Burns. Harry is the son of K. C. Burns, the owner and sole proprietor of Building Specialties. As an employee of Building Specialties, Harry had limited authority to receive payments on accounts due Building Specialties from its subcontracts and materials brokerage business. Harry also had authority to deposit funds to the Building Specialties' account at First National and to bid contracts (although not here involved, there is some question as to whether he could bind Building Specialties generally by signing contracts).

In 1966, Harry began having serious money problems which he attempted to solve by taking out a loan at a Tulsa bank in the name of K. C. Burns. As security for the loan, Harry forged his father's and mother's names to a mortgage on their home. Eventually the loan came due and Harry was without funds to satisfy it. Harry solved this problem by taking out a new loan with Mercantile. Harry represented himself to Mercantile as K. C. Burns, Jr., and told Mercantile that he and his father were partners in Building Specialties. Harry showed Mercantile his father's tax return for the previous year which he represented

as his own. As security for the Mercantile loan, Harry offered to assign the proceeds of a subcontract awarded to Building Specialties on a building under construction on a general contract let to Grimshaw.

Prior to making the loan, officers of Mercantile contacted Grimshaw to verify the existence of the subcontract and to discover the nature of Grimshaw's business experiences with Building Specialties. Mercantile learned that Building Specialties did have a subcontract with Grimshaw and that Grimshaw had a long and positive business relationship with Building Specialties and K. C. Burns.[1] So assured, Mercantile made the loan and established an account for Building Specialties. Loan proceeds were used to pay Harry's other bank creditor. Mercantile notified Grimshaw of the assignment and requested that all disbursals on the subcontract to Building Specialties be payable jointly to Mercantile and Building Specialties. Mercantile supplied Harry with a stamp for indorsement purposes bearing the words, "PAY TO THE ORDER OF MERCANTILE NATIONAL BANK, Tulsa, Oklahoma FOR DEPOSIT ONLY BUILDING SPECIALTIES COMPANY 1–72–918–2."

Materials were ordered, delivered and installed under the subcontract. Grimshaw made disbursals to Harry in the form of progress payments on three different occasions. The first two checks were payable jointly to Mercantile and Building Specialties and, Mercantile having certified full payment of the loan after receipt of the first two checks, the last check was payable only to Building Specialties. All three checks were indorsed by Harry, the first two by use of the stamp and the last written indorsement reading, "BUILDING SPECIALTIES CO. FOR DEPOSIT ONLY."

The end came when the manufacturer of the materials used on the subcontract con-

1. The Grimshaw-Building Specialties subcontract bears a signature purportedly that of K. C. Burns on behalf of Building Specialties as owner. The evidence shows that Harry Burns signed his father's name. Grimshaw alleged

that "said contract bears the signature by, or authorized by K. C. Burns." The validity of the contract, although signed by Harry Burns, was not in issue.

tacted Grimshaw complaining that it had not been paid. Grimshaw, in turn, contacted K. C. Burns, and Harry, sensing his "charade" was over, departed to points unknown. Grimshaw, in order to get the materialman's lien released, paid for the materials.

Grimshaw sued First National for wrongful payment of checks alleging an unauthorized payee indorsement and National Bank of Tulsa and Mercantile on their indorsements as "collecting bank" and "depository bank" respectively. 12A O.S.1971, § 4–105 (definitions). 12A O.S.1971, § 3–417(2)(b) (warranties of indorsements). K. C. Burns intervened seeking recovery against all three banks for the full amount of the checks or in the alternative against Grimshaw, should it recover, for the difference between Grimshaw's loss and the full value of the checks. First National cross-petitioned against National Bank of Tulsa and Mercantile on their warranties of indorsements. 12A O.S.1971, § 3–417(2)(b). Grimshaw ultimately dismissed as to all banks except First National. Trial was to a jury and the verdict was for the defendant banks as against both Grimshaw and K. C. Burns. Default judgment had previously been entered against Harry in favor of First National.

Grimshaw alone appealed. The Court of Appeals reversed entering judgment as a matter of law in favor of Grimshaw and remanded the cause for disposition of First National's cross-petition against the other banks. First National petitioned for Writ of Certiorari to review the opinion of the Court of Appeals.

Before discussing the issues presented we should first point out that Grimshaw did not seek judgment against Building Specialties, K. C. Burns, or Harry Burns, although it had paid the materialman's lien that should have been paid by Building Specialties under the Grimshaw-Building Specialties subcontract. Also, only the right and obligations existing between Grimshaw and First National are involved in this appeal.

■ Grimshaw was the drawer of the three checks on its account as a depositor of First National. The relationship between Grimshaw as drawer of the checks and First National as drawee is that of creditor and debtor respectively. State Guaranty Bank v. Doerfler, 99 Okl. 258, 226 P. 1054 (1934). For the most part in the area of negotiable instruments and bank collections, the Uniform Commercial Code (UCC) incorporates much of prior statutory and common law. The UCC did not change the nature of the relationship between banks and their depositors. An implied-in-law condition of the bank's contract with its depositor is to refrain from charging the depositor's account with items which are not ordered by or on authority of the depositor. Brown v. Eastman Nat'l Bank, Okl., 291 P.2d 828, 55 A.L.R.2d 971 (1955); Guthrie Nat'l Bank v. Gill, 6 Okl. 560, 54 P. 434 (1898). As a general rule, a drawee bank which pays an item containing a payee indorsement not by or on authority of the payee does so with its own funds and may not charge the drawer's account. Leather Mfrs' Nat'l Bank v. Merchants' Nat'l Bank, 128 U.S. 26, 9 S.Ct. 3, 32 L.Ed. 342 (1888); State Guaranty Bank v. Doerfler, supra.

■ A drawee bank may, of course, attempt to establish the indorsement as being that of the intended payee or his authorized agent. A payee indorsement is effective when made by an authorized agent or representative, "and his authority to make it may be established as in other cases of representation." 12A O.S.1971, § 3–403(1). An unauthorized payee indorsement is "one made without actual, implied or apparent authority and includes a forgery." 12A O.S.1971, § 1–201(43).

It necessarily follows that one of the primary issues presented was whether Harry had actual, apparent or implied authority to indorse the three checks. If Harry did not have such authority, the next issue would be whether First National established a defense for paying the checks on an unauthorized indorsement.

The evidence in the record tends to support First National's theory that Harry had

actual authority to indorse checks. At the time of the transactions in question, K. C. Burns was of advanced years and in poor health. Building Specialties was in financial trouble and Harry had become more visible in the business. Harry's wife kept the company books and Building Specialties had the appearance of a family business. Harry had authority to pick up checks from various customers including Grimshaw; solicit jobs and make bids on contracts; sign his own name to business letters on Building Specialties' stationery; and make deposits for Building Specialties in its account at First National. K. C. Burns knew a subcontract had been entered into with Grimshaw, but that he had not signed the contract. In fact, Harry signed Building Specialties by K. C. Burns, as owner.

The same evidence is sufficient to raise a question of fact on whether Harry had apparent or implied authority to indorse the checks. In *Rosser-Moon Furniture Co. v. Oklahoma State Bank*, 192 Okl. 169, 135 P.2d 336 (1943), we said the authority of an agent may be established from appearance or by implication where:

> "* * * the principal, by statements or conduct, 'places the agent in a position where he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such a position,' so that third persons are justified in believing that the agent is within his authority, * * *. And the scope of such apparent authority is to be determined not only by what the principal actually does know of the acts of the agent within the employment, but also by 'what he should, in the exercise of ordinary care and prudence', know the agent is doing in the agency transaction."

Grimshaw argues no apparent or implied agency can arise because no one relied on any conduct of K. C. Burns as principal. Although no person may have relied on any affirmative statements or conduct of the principal, K. C. Burns, in concluding Harry had the authority to indorse and deposit the checks, the operative conduct relied on could have been an omission on the part of K. C. Burns "in the exercise of ordinary care and prudence" to be aware of his agent's (Harry's) activities.

■ We hold there was sufficient evidence to raise a question of fact for submission to the jury on the question concerning Harry's actual, apparent or implied authority to indorse the three checks. We will now consider First National's defenses if the jury should find that Harry did not have the actual, apparent or implied authority to indorse the three checks.

■ The UCC defenses for charging a drawer's account for an instrument containing an unauthorized payee indorsement are based on policy considerations intended to foster the commercial reliability of negotiable paper. The general theory of the UCC is to allow the loss to fall, as among the innocent parties involved, on that person who was closest to the individual causing the loss and presumably the person who had the best opportunity to avoid the loss. Thus, the UCC provides for recourse by the drawee bank down the chain of title to the instrument against each payor on his warranty of indorsements. 12A *O.S.*1971, § 3-417(2)(b). In such a case, the loss would fall on the individual to whom the forger or unauthorized person first indorsed the check. However, under certain circumstances an admittedly bad indorsement is treated as an authorized indorsement for the purposes of the law causing the loss to remain with the drawer. One of these defenses is set forth in 12A *O.S.*1971, § 3-406, which provides in part:

> "Any person who by his negligence substantially contributes to * * * the making of an unauthorized signature is precluded from asserting the * * * lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in * * * accordance with the reasonable commercial standards of the drawee's or payor's business."

■ By the terms of § 3-406, if Grimshaw was negligent and that negligence substantially contributed to the making of an unauthorized signature, it is precluded

from asserting the lack of authority against First National assuming First National paid the checks in accordance with the reasonable commercial standards of its business. Over a number of years, Grimshaw's business relations with Building Specialties and K. C. Burns had been good. Grimshaw knew Harry Burns and knew Harry had at least some authority to transact business for Building Specialties. Grimshaw delivered the checks in question to Harry. Grimshaw honored the "assignment of monies under contract" to Mercantile and caused two of its checks to be drawn to Mercantile and Building Specialties as joint payees, even though Harry had signed the name of K. C. Burns to the subcontract and the assignment of monies. We hold there was sufficient evidence to raise a question of fact for submission to the jury as to whether there was any negligence on the part of Grimshaw which substantially contributed to the making of the unauthorized indorsements by Harry.

■ Another defense accorded First National as the drawee bank is the defense known as "the imposture rule". 12A O.S. 1971, § 3–405. There is no need to discuss the provisions of § 3–405, although the parties made much of it at trial. It is enough to say that although Harry used an assumed name throughout his fraudulent scheme, at all times relevant to the three checks in question Harry was precisely who he represented himself to be, the son of K. C. Burns. The imposture rule has no application to these facts. See 12A O.S.A. § 3–405, *"Uniform Commercial Code Comments"* (2).

■ The last defense available to First National under these facts is the defense of estoppel. Estoppel is incorporated into the UCC as a supplemental principle of law. 12 A O.S.1971, § 1–103. The elements of equitable estoppel have been fully discussed on many prior occasions and we see no reason to recatalogue them here. See *Board of County Commissioners of Marshall County v. Snellgrove,* Okl., 428 P.2d 272 (1967).

In our opinion at least two instructions given by the trial court were prejudicial to Grimshaw. Instruction No. 6, states:

INSTRUCTION NO. 6:

"You are instructed that it is the contention of the defendants that the W. R. Grimshaw Company by the inducement and assurance of its President, W. R. Grimshaw, Jr., caused the Building Specialties Company account to be set up at the Mercantile National Bank.

"If you do not so find from a preponderance of the evidence, then your verdict should be for the plaintiff and the intervenor.

"If you do so find from a preponderance of the evidence, then your verdict should be for the defendants."

INSTRUCTION NO. 8:

"You are instructed that it is the contention of the defendants that the W. R. Grimshaw Company recognized Harry Burns as the agent of the intervenor, K. C. Burns, either actual, apparent or implied, to open an account in the Mercantile National Bank; execute a loan on behalf of the Building Specialties Company; assign to the bank monies to be due Building Specialties Company from the plaintiff; and to endorse checks from plaintiff to Building Specialties Company under the contract.

The burden of proving recognition of such authority is on the defendant. Therefore, unless you find that such recognition occurred, then your verdict should be for the plaintiff and the intervenor.

"If you find that such recognition did occur of such acts and for such purposes, then your verdict should be for the defendants."

Neither Instruction No. 6 nor Instruction No. 8, is a proper statement of the law as to either the defense of negligence under § 3–406, or the defense of equitable estoppel. Neither instruction fairly states the defense of estoppel because no reference is made to the essential finding that the inducement,

assurance or recognition was given by Grimshaw with knowledge of or reckless disregard for the truth. No attempt is made in either instruction to inform the jury of the other essential elements of estoppel which must necessarily be found by the jury to preclude recovery by Grimshaw.

Likewise, neither instruction fairly instructs the jury on § 3–406, the defense of negligence. The jury is never informed that the inducements and assurances of Grimshaw or Grimshaw's recognition of Harry as an agent must be the product of some negligence on the part of Grimshaw. The jury is not told by either instruction that the negligence resulting in the inducements, assurances or recognition must "substantially contribute" to the making of the unauthorized indorsements.

▉▉▉ The trial court did instruct the jury on "ordinary care" and "actionable negligence", which was proper since the UCC defines neither term [see 12A O.S.A. § 3–406, "Uniform Commercial Code Comments' (3)], but it gave no instruction that would have related those definitions to the facts and given Grimshaw any benefit of § 3–406, supra. In other words, when the instructions are considered as a whole, the jury could have found Harry had no actual, apparent or implied authority to indorse the checks and yet still have rendered a verdict in favor of First National without considering whether Grimshaw was guilty of any negligence that substantially contributed to the making of the unauthorized indorsements by Harry. The instructions constitute reversible error and Grimshaw is entitled to a new trial.

Writ of Certiorari granted; Decision of the Court of Appeals vacated; Judgment of the trial court reversed; and Cause remanded with Instructions to grant Grimshaw a new trial.

LAVENDER, V. C. J., and DAVISON, WILLIAMS, BARNES and SIMMS, JJ., concur.

HODGES, C. J., and DOOLIN, J., dissent.